**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| MEDICAL UNIVERSITY HOSPITAL AUTHORITY/MEDICAL CENTER OF THE MEDICAL UNIVERSITY OF SOUTH CAROLINA, | ) ) ) ) | Civil No. 2:11-cv-1522 |
| Plaintiff, | ) ) ) | **ORDER** |
| vs. | ) ) | |
| OCEANA RESORTS, LLC AND OCEANA RESORTS, LLC GROUP BENEFIT PLAN, | ) ) ) | |
| Defendants. | ) ) ) | |

This matter is before the court on defendants' motion to dismiss, or in the alternative, for summary judgment, on the grounds that plaintiff lacks standing under 29 U.S.C. § 1132(a)(1)(B).  For the reasons set forth below, the court denies defendants' motion to dismiss, but grants the motion for summary judgment.

## I.  BACKGROUND

Plaintiff Medical University Hospital Authority/Medical Center of the Medical University of South Carolina (MUSC) is a hospital providing health care. MUSC brought this suit against Oceana Resorts, LLC and Oceana Resorts, LLC Group Benefit Plan for services MUSC provided to a patient who was a participant of defendants' self-funded employee benefits plan.  MUSC's Complaint alleges the following:

MUSC provided inpatient care to Stephen Showers from January 3, 2010 through March 17, 2010, and provided outpatient care to him on June 2 and June 21

1

of 2010.  At the time Mr. Showers was treated at MUSC, he was an employee of

defendant Oceana Resorts, LLC (Oceana) and participated in Oceana's self-funded

employee welfare benefits plan (the Plan).  TCC of South Carolina (TCC) served as

the Third Party Administrator (TPA) of that Plan and BlueCross and BlueShield of

South Carolina Preferred Blue Network (Blue Cross) was its Preferred Provider

Organization.  As part of the admission process to MUSC, Mr. Showers signed a

"Consent for Medical Treatment" form (Consent Form).  MUSC claims this Consent

Form assigned benefits from the Plan to MUSC.  When MUSC submitted claims for

Mr. Showers' care by way of Blue Cross and TCC, the Plan denied the claims based

on a Plan exclusion for experimental and/or investigational services, supplies, care,

and treatment.  MUSC appealed this decision on November 17, 2010, and then filed a

second level appeal on March 22, 2011.  These appeals were denied on January 27,

2011 and April 25, 2011, respectively.  MUSC claims that the Plan's decision to deny

benefits was unreasonable and filed the instant suit pursuant to the Employee

Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a) and (g).

     Defendants have provided this court with copies of the Plan document and the

Consent Form.  The Plan document contains an anti-assignment provision, which

states,

> Protection Against Creditors
>
> No benefit payment under this Plan shall be subject in any way to
> alienation, sale, transfer, pledge, attachment, garnishment, exception
> or encumbrance of any kind, and any attempt to accomplish the same
> shall be void.  If the Company shall find that such an attempt has been
> made with respect to any payment due or to become due to any
> Covered Participant, the Company, in its sole discretion, may
> terminate the interest of such Covered Participant or former Covered
> Participant, his spouse, parent, adult child, guardian of a minor child,

> brother or sister, or other relative of a Dependent of such Covered
> Participant or former Covered Participant, as the Company may
> determine, and such application shall be a complete discharge of all
> liability with respect to such benefit payment.

Defendants argue that this anti-assignment provision prohibited Mr. Showers from assigning his benefits under the Plan to MUSC, and therefore, MUSC could not acquire standing based on any purported assignment.

Defendants also claim that the Consent Form, a document prepared by MUSC, did not effectuate an assignment of the Plan benefits because the terms of the assignment only cover insurance policies, and the Plan is not an insurance policy. The assignment in the Consent Form reads:

> I assign and transfer to The Hospital and / or my doctors all rights,
> interest in benefits I may have under any insurance policy I may have,
> including but not limited to hospitalization, medical, third party
> liability insurance coverage, workers compensation benefits, or
> benefits paid by Medicare or Medicaid.  This assignment is intended to
> include any interest in benefits that I may have relating to this date of
> service as well as any prior dates of service.  I direct that any insurance
> company or other party make payment of such benefits to The
> Hospital or my doctor.  I authorize The Hospital and/ or my doctor to
> collect benefits from any responsible third party through whatever
> means may be deemed necessary, and to endorse benefit checks made
> payable directly to me.

Plaintiff has not contested the accuracy of these documents.

## II.  STANDARD

Defendants filed the motion to dismiss for lack of standing under Civil Procedure Rule 12(b)(1).  Under Rule 12(b)(1), courts consider whether the suit constitutes a case or controversy over which federal courts have jurisdiction pursuant to Article III.   See CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 52 (4th Cir. 2011).  However, "[t]o bring a civil action under ERISA, a plaintiff must have . .

3

. statutory standing." Hastings v. Wilson, 516 F.3d 1055, 1060 (8th Cir. 2008); see e.g., In re Mut. Funds Inv. Litig., 529 F.3d 207, 216 (4th Cir. 2008) (analyzing the ERISA plaintiffs' Article III and statutory standing separately). The "concept [of statutory standing is] distinct from Article III and prudential standing. And typically, a dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim." CGM, LLC, 664 F.3d at 52 (internal quotations omitted). Because defendants argue plaintiff lacks statutory standing, this court will consider whether plaintiff sufficiently stated a claim upon which relief can be granted rather than analyze the case under Rule 12(b)(1).

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." Rule 8(a)(2) provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1949. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 1950.

If plaintiff's complaint is deemed to state a claim upon which relief could be granted, the court may then consider whether summary judgment is appropriate based on the undisputed facts.  Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Anderson, 477 U.S. at 255.  If evidentiary materials eliminate all factual disputes, summary judgment is appropriate on questions of law.  Scott v. Harris, 550 U.S. 372, 381 n.8 (2007); Interactive Motorsports & Enter. Corp. v. Dolphin Direct Equity Partners, LP, 419 Fed. App'x 60, 61 (2d Cir. 2011) ("Interpretations of the terms of a legally binding agreement, such as a contract, are questions of law and therefore appropriate for summary judgment.").

### III.   MOTION TO DISMISS

The parties agree that plaintiff MUSC lacks direct standing to sue for benefits from the Plan because MUSC is neither a participant or beneficiary under 29 U.S.C. § 1132(a)(1)(B).[1]  MUSC claims, however, that it has derivative standing because Mr. Showers assigned his benefits to MUSC when he signed the Consent Form.  For some unknown or perhaps strategic reason, the Complaint did not include the language of the alleged assignment or attach the Consent Form.  The Complaint also did not include information regarding any anti-assignment provision in the Plan document.

Although the Fourth Circuit has "never specifically addressed the question of derivative standing for ERISA benefits" in a published opinion, Brown v. Sikora & Assocs., 311 Fed. App'x 568, 570 (4th Cir. 2008),[2] it has based at least two of its opinions on the presumption that a healthcare provider either did or could have acquired derivative standing.  See Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120 (4th Cir. 1994) (addressing substantive issues in a suit by a hospital against a Plan and its administrator, and thereby implicitly holding that the hospital had derivative standing to bring the claim); HealthSouth Rehab. Hosp. v. Am. Nat'l

---

[1] "A civil action may be brought. . . by a participant or beneficiary. . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B)(a).

[2] The Fourth Circuit's unpublished opinion, Brown, 311 Fed. App'x at 570, also commended its "sister circuits [for] consistently recogniz[ing derivative] standing based on the valid assignment of ERISA . . . benefits" because the "cases represent[ed] a careful balance of competing concerns . . . [and] further[ed] the explicit purpose of ERISA."  For other circuits' opinions on acquiring derivative standing under ERISA, see, e.g., Montefiore Med. Ctr. v. Teamsters Local 272, 642 F.3d 321, 330 (2d Cir. 2011); Tango Transp. v. Healthcare Fin. Servs. LLC, 322 F.3d 888, 893 (5th Cir. 2003); Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1277 (6th Cir. 1991); Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund, 538 F.3d 594, 597-98 (7th Cir. 2008); Lutheran Med. Ctr. v. Contractors Health Plan, 25 F.3d 616, 619 (8th Cir. 1994); Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc., 187 F.3d 1045, 1047-51 (9th Cir. 1999); Conn. State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1347 (11th Cir. 2009).

Red Cross, 101 F.3d 1005, 1008 (4th Cir. 1996) (reasoning that a hospital could have acquired derivative standing if the patient/signatory of the consent form had been a participant or the beneficiary of the self-funded plan). Because it is possible for a medical provider to acquire derivative standing through an assignment of benefits by a plan participant, MUSC's Complaint states a plausible claim for relief, and therefore, defendants' motion to dismiss is denied.

## IV. MOTION FOR SUMMARY JUDGMENT

Defendants have provided the court with a copy of the Plan document and MUSC's Consent Form. Defendants assert that an anti-assignment provision in the Plan document prohibited Mr. Showers from making any assignment; therefore, the alleged assignment in the Consent Form is unenforceable, and MUSC has no derivative standing. Furthermore, defendants claim that the Consent Form failed to assign Mr. Showers' benefits under the Plan because the Consent Form only assigned benefits due under an "insurance policy" and the self-funded plan is not "insurance." The only dispute before the court is the interpretation of these contracts.

First, MUSC argues that the Plan implicitly assigned benefits to all network providers based on the payment structure laid out in the Plan, and therefore, MUSC did not even need the Consent Form to obtain derivative standing. Under the terms of the Plan, a participant need only pay the deductible to a network provider from whom he or she obtains medical services. The network provider is then required to file its claim for those services with the TPA. The Plan states that the network provider will receive the scheduled amount as payment in full for the medical services. The terms of the Plan indicate that generally some party other than the participant will reimburse

7

the Plan for the claims. Defendants agree that MUSC is a network or preferred provider.

The payment structure outlined in the policy is not an "assignment" in the traditional sense nor does it fall within the definition of assignment that applies to other ERISA plans, i.e. pension plans. Traditionally, when a party contracting to give benefits designates a party to whom the benefits are due, the latter party is the beneficiary, not the assignee. See Williston on Contracts § 37:1 (3d ed. 1959); In re Spong, 661 F.2d 6, 10-11 (2d Cir. 1981); La Mourea v. Rhude, 295 N.W. 304 (Minn. 1940) (describing the relationship between third party beneficiaries as opposed to assignees). A person becomes an assignee when the beneficiary of the contract gives its rights to another party. The Seventh Circuit has described the relationship between the parties in an assignment, holding "Privity accompanies a valid assignment of a contract because it puts the assignee in the shoes of the assignor— since the assignor was in privity with the other contracting party, the assignee is as well." Kaplan v. Shure Bros. Inc., 153 F.3d 413, 418-19 (7th Cir. 1998). South Carolina courts have also found this definition appropriate. See, e.g., Singletary v. Aetna Cas. & Sur. Co., 447 S.E.2d 869, 870 (S.C. Ct. App. 1994) (holding that an "assignee . . . stands in the shoes of its assignor"); see also Singer Asset Fin. Co. v. Conn. Gen. Life Ins., 975 So.2d 375 (Ala. App. 2007) ("When a party assigns its rights under a contract to an assignee, the assignee steps into the shoes of the assignor and possess all the right the assignor originally possessed, but nothing more."). Thus, an assignee acquires an "assignment" from the party that it wishes to stand in the

place of.  MUSC wishes to replace Mr. Showers, not the Plan, therefore, MUSC could not have obtained an assignment from the Plan.

As the discussion above makes clear, the traditional definition of assignment is one party to a contract giving *its own rights* to a third party, binding the other contracting party to pay or perform duties to the third party.  Tax regulations have applied this definition of assignment to ERISA pension plans.  Boggs v. Boggs, 520 U.S. 833, 851 (1997) (referencing 26 C.F.R. § 1.401(a)-13).  While tax regulations govern only pension plans in 29 U.S.C. § 1056(d) and have not defined assignments for welfare benefits plans, the definition confirms the traditional definition of assignment in one ERISA context, making it more likely that this was the intended definition in the ERISA context generally.  26 C.F.R. § 1.401(a)-13 defines assignment as:

> (i) Any arrangement providing for the payment to the employer of plan benefits which otherwise would be due the participant under the plan, and
> (ii) Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

Subpart (i) requires that a payment be made to an employer.  MUSC is not Mr. Showers' employer, thus, subpart (i) would be inapplicable.  The Plan also does not create an assignment described in subpart (ii), which requires that an agreement be obtained from a participant or beneficiary, not the Plan itself.  MUSC is arguing that the implicit assignment was given by the Plan, not Mr. Showers.  While this regulation does not directly apply to welfare benefits plans, it confirms the traditional relationship between an assignee and an assignor.  An arrangement whereby the Plan

sets up a default payment structure to provide payments to a medical provider would not constitute an assignment, under this regulation or the traditional definition of assignment.

MUSC did not claim that it had standing as a third-party beneficiary of the Plan; nor could it have successfully pursued this argument. The only Circuit to squarely address this issue held that "ERISA does not countenance third-party beneficiary claims," and found, therefore, that a hospital could not have independent standing without an enforceable assignment from the participant. Dallas Cnty. Hosp. Dist. v. Assoc.'s Health & Welfare Plan, 293 F.3d 282, 289 (5th Cir. 2002). Thus, without a valid assignment from a beneficiary or a participant, MUSC could not have obtained derivative or direct standing.

Second, MUSC argues that even if the court refuses to find an implied assignment to all network providers by the Plan, MUSC obtained a valid assignment via the Consent Form. Defendants argue that the assignment in the Consent Form is unenforceable because (1) the Plan contains a broad anti-assignment provision, and (2) the Consent Form covers only insurance, and the self-funded Plan is not a form of insurance.

Courts have held that "an unambiguous anti-assignment provision in an ERISA-governed welfare benefit plan is valid and enforceable. . . . Because ERISA-governed plans are contracts, the parties are free to bargain for certain provisions in the plan—like assignability." Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc., 371 F.3d 1291, 1296 (11th Cir. 2004).[3] The Fourth Circuit has

---

[3] See also La. Health Servs. & Indem. Co. v. Rapides Healthcare Sys., 461 F.3d 529, 537 (5th Cir. 2006) ("Absent a statute to the contrary, an anti-assignment provision in a plan is

instructed courts to interpret ERISA self-funded plans by "ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense."  Wheeler v. Dynamic Eng'g, Inc., 62 F.3d 634, 638 (4th Cir. 1995).  Furthermore, the provisions should be read "not in isolation, but as a whole."  Dallas Cnty. Hosp., 293 F.3d at 288.  While ERISA plans should be interpreted "under federal common law, [courts] may use principles of state common law to guide [the] analysis."  Wheeler, 62 F.3d at 638.

"In construing terms in contracts, this Court must first look at the language of the contract to determine the intentions of the parties."  C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n, 373 S.E.2d 584, 586 (S.C. 1988).  If the language of the contract is "perfectly plain and capable of legal construction," it alone determines the document's force and effect.  Superior Auto. Ins. Co. v. Maners, 199 S.E.2d 719, 722 (S.C. 1973).  "[W]hen a contract is clear and unambiguous, the construction thereof is a question of law for the court," Bowen v. Bowen, 547 S.E.2d 877, 880 (S.C. Ct. App. 2001), and the court does not have authority to modify the terms of the contract.  Patricia Grand Hotel, LLC v. MacGuire Enters., 643 S.E.2d 692, 695 (S.C. Ct. App. 2007).

MUSC relies upon Dallas County Hospital, 293 F.3d at 288, to argue for an implied exception to the anti-assignment provision for network providers; however, the case is clearly distinguishable from the facts presented here.  In Dallas County

---

permissible under ERISA."); Riverview Health Inst., LLC v. Med. Mut. of Ohio, 601 F.3d 505, 521-22 (6th Cir. 2010) (holding anti-assignment provisions could be enforceable); City of Hope Nat'l Med. Ctr. v. HealthPlus, Inc., 156 F.3d 223, 229 (1st Cir. 1998) ("Consistent with the other circuits which have addressed this issue, we hold that ERISA leaves the assignability or non-assignability of health care benefits under ERISA-regulated welfare plans to negotiations of the contracting parties.").

Hospital, the court found that a plan's broad anti-assignment clause was ambiguous as applied to preferred providers because the contract also, "[i]n the clearest terms, . . . authorized assignments to Preferred Providers by directing that 'assignment may be made directly to the provider.'" Id. at 289. The Fifth Circuit construed the ambiguity against the plan and held that the plan had "authorized assignments of benefits to network providers." Id. This language permitting assignment was critical to the court's holding, and the court found that the hospital would not otherwise have been able to obtain standing based on its role as a third-party beneficiary.

MUSC admits that "[u]nlike the plan in the Dallas [County] Hospital case, the Oceana Resorts Plan does not contain specific language allowing an assignment to a Network provider." MUSC instead argues, "the Plan implies such an assignment" because the network providers are presumably reimbursed by the TPA or the network based on a scheduled fee arrangement, rather than by the participant.[4] The crux of MUSC's argument is that because the Plan could permit payments to be made directly to a network provider, the participant could also designate payments to be made directly to a network provider. MUSC's logic is unsound. The fact that one party has specific rights under a contract does not necessitate that the other party to that contract has those rights also, especially when the parties specifically contracted to deny the second party those rights.

The terms of the contract imply that the Plan or the TPA or Blue Cross may make payments to a network provider, but it categorically forbids the participant from assigning payments. These two mandates are not contradictory to each other, but

---

[4] The Plan does not actually say who will pay the preferred provider, only that the preferred provider will accept the scheduled fee as payment, and that the participant will only be charged the deductible.

simply indicate which party has the power to designate an alternative recipient of payments.  In this case, only the Plan may designate an alternative recipient for payments.[5]

Next, MUSC points to the second sentence of the anti-assignment provision to demonstrate that the Plan intended to exempt network providers from the provision. This sentence allows the company to terminate benefits to a covered participant who attempts to assign "any payment due or to become due to any Covered Participant." MUSC argues that this sentence should be read to cover only non-network providers, because payments to network providers are not paid to covered participants.  The fact that this provision does not typically apply to network providers (because a participant has no reason to assign benefits to such a provider) does not mean that the Plan intended to exempt network providers from the provision.  If the court finds the anti-assignment provision enforceable, any disputed amount would become due to the Covered Participant regardless of the default payment structure, making the sentence applicable to network and non-network providers alike.[6]  The implied exception MUSC seeks is contrary to clear intentions of the parties evinced by the plain language of the contract.  The meaning of the anti-assignment provision should be gathered first from the plain language of the contract.  While a Plan may decide that it is most efficient to pay a network provider directly for uncontested claims, this does

---

[5] Additionally, MUSC attempts to rely on its contract with Blue Cross; however, this contract cannot give the participant rights that a contract between the participant and the Plan expressly preclude.

[6] Even if the court assumed that MUSC's interpretation of the second sentence is correct, this interpretation would not create an ambiguity in the previous sentence's broad prohibition of assignments.  It is entirely reasonable for the Plan to forbid assignment to all providers, but only terminate a Covered Participant for assigning benefits to non-network providers.

not give the participant a right to designate an alternative recipient, even that same network provider, when the contract clearly forbids such a right.

Based on the "universally recognized canons of contract interpretation," LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc., 298 F.3d 348, 352 (5th Cir. 2002), this court refuses to create an ambiguity unsupported by the language of the contract and contrary to the apparent intentions of the parties. Because the Plan clearly prohibited Mr. Showers from assigning his Plan benefits, Mr. Showers' attempted assignment to MUSC was ineffective and cannot serve as the basis for derivative standing. At the end of the day, MUSC is nothing more than a third party beneficiary, at best.[7] While MUSC has tried to repackage its role in multiple guises, it cannot overcome the fact that ERISA does not provide statutory standing for third-party beneficiaries. Because the facts are not in dispute and the interpretation of the contract is a question of law, summary judgment is appropriate for defendants.

Additionally, the Consent Form, which was prepared by MUSC, does not cover assignments to self-funded employee benefits plans. The Consent Form assigns benefits due under "any insurance policy." The assignment provides examples of types of coverage which would be assigned, all of which are types of insurance. Section 1144(b)(2)(B) of ERISA forbids states from deeming an employee benefits plan "to be an insurance company or other insurer . . . or to be engaged in the business of insurance." See also Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 372 (2002) ("ERISA's 'deemer' clause provides an exception to its saving clause that

---

[7] Since ERISA does not permit derivative standing to third party beneficiaries, the court need not analyze whether MUSC actually has obtained third party beneficiary status.

prohibits States from regulating self-funded plans as insurers."). The Fourth Circuit, therefore, has held that "[t]hird-party administrator[s], [are] not . . . insured[s]." Sheppard & Enoch Pratt Hosp., 32 F.3d at 123 n.1; but see Wheeler, 62 F.3d at 638 (discussing self-funded "ERISA health insurance plan" and applying principles of insurance law).

For the same reason, a self-funded employee benefits plan document is not an "insurance policy." The assignment paragraph goes on to describe how "such benefits" should be paid or collected. While those provisions state that MUSC may collect from an "other party" or "any responsible third party," the sentences modify the benefits previously assigned, which are limited to benefits from an "insurance policy." MUSC wrote the Consent Form and is bound by the document it authored. Because the terms of the Consent Form do not cover self-funded employee benefits plans, the Consent Form did not give MUSC derivative standing, and summary judgment is again appropriate for defendants.

## V.  CONCLUSION

For the foregoing reasons, the court **DENIES** defendants' motion to dismiss, but **GRANTS** their motion for summary judgment.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 2, 2012**
**Charleston, South Carolina**

15